Final Brief

[ORAL ARGUMENT NOT YET SCHEDULED]

Nos. 15-1050, 15-1097

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

RUSH UNIVERSITY MEDICAL CENTER,

Petitioner/Cross-Respondent,

v.

NATIONAL LABOR RELATIONS BOARD,

Respondent/Cross-Petitioner,

and

INTERNATIONAL BROTHERHOOD OF TEAMSTERS,
LOCAL 743,

Intervenor.

**ON CROSS-PETITIONS FOR REVIEW AND ENFORCEMENT OF
A DECISION AND ORDER OF THE NATIONAL LABOR
RELATIONS BOARD**

**REPLY BRIEF OF PETITIONER/CROSS-RESPONDENT
RUSH UNIVERSITY MEDICAL CENTER**

Kenneth F. Sparks
Mark L. Stolzenburg
Vedder Price P.C.
222 North La Salle St., Suite 2600
Chicago, Illinois 60601-1003
(312) 609-7500

## TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY OF ARGUMENT ........................... 1

ARGUMENT ........................................................................... 3

I.   Allowing Repetitive, Piecemeal Elections and Negotiations in
     an Acute-Care Hospital is Contrary to NLRB Regulation and
     Policy and Disruptive to Patient Care .............................................. 3

     A.   The Health Care Rule and NLRB Case Law Required
          Residual Employees to Be Organized in a Single
          Election until the NLRB's Recent Change ............................. 3

          1.   The NLRB in *St. John's* Concluded that
               Piecemeal Residual Elections Are Not Permitted
               Even When Employees Are to be Added to an
               Existing Unit ................................................................. 4

          2.   Requiring All Residual Employees to Vote in a
               Single Election Is Consistent with *Armour-Globe*
               Election Principles ........................................................ 7

     B.   A PCT-Only Election Is At Odds with Established
          Labor Policy ...................................................................... 12

     C.   The NLRB Inexplicably Failed to Give Any
          Consideration to the Risks Associated with Organizing,
          Negotiations and Strikes Discussed in Its Case Law
          and in Rush's Offer of Proof ................................................. 16

II.  The Board's Brief Misapplies NLRB Precedent and
     Misconstrues the Factual Record Regarding Nurse Assistant
     IIs ........................................................................................... 22

     A.   Undisputed Facts Demonstrated that PCTs and NAIIs
          Are Nearly Identical ........................................................... 22

     B.   NLRB Precedent Requires Inclusion of NAIIs with
          PCTs .................................................................................. 25

CONCLUSION ................................................................................ 28

-i-

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*BB&L, Inc. v. NLRB,*
  52 F.3d 366 (D.C. Cir. 1995) ............................................................... 18

*Beverly Health and Rehab. Servs.,*
  322 N.L.R.B. 968 (1997) ................................................................... 16

*Blue Man Vegas, LLC v. NLRB,* *
  529 F.3d 417 (D.C. Cir. 2008) .............................................................. 2

*Children's Hospital Oakland,*
  351 N.L.R.B. 569 (2003) ................................................................... 19

*Country Ford Trucks v. NLRB,*
  229 F.3d 1184 (D.C. Cir. 2000) ............................................................ 2

*Crittenton Hospital,*
  328 N.L.R.B. 879 (1999) ............................................................ 10, 11

*Detroit Newspaper Agency v. NLRB,*
  435 F.3d 302 (D.C. Cir. 2006) ............................................................ 18

*Don Lee Distributor, Inc. v. NLRB,*
  145 F.3d 834 (6th Cir. 1998) ............................................................. 21

*Kaiser Foundation Health Plan of Colorado,* *
  333 N.L.R.B. 557 (2001) ............................................................ 9, 10

*Kaiser Foundation Hospitals,*
  312 N.L.R.B. 933 (1993) ............................................................ 10, 11

*Lemoyne-Owen College v. NLRB,*
  357 F.3d 55 (D.C. Cir. 2004) .............................................................. 2

*Mary Thompson Hospital, Inc.,* *
  242 N.L.R.B. 440 (1979) ................................................................... 8

*McKeesport Hospital,*
  220 N.L.R.B. 1141 (1975) ................................................................. 9

*NLRB v. Baptist Hospital, Inc.,*
  442 U.S. 773 (1979) ...................................................................... 14

*Oakwood Hospital Corp.,* *
  219 N.L.R.B. 620 (1975) ................................................................... 8

*Pirlott v. NLRB,*
  522 F.3d 423 (D.C. Cir. 2008) ............................................................. 2

*Progressive Elec., Inc. v. NLRB,*
  453 F.3d 538 (D.C. Cir. 2006) ............................................................. 5

CHICAGO/#2749507.5

## TABLE OF AUTHORITIES
(continued)

*Randell Warehouse of Arizona, Inc. v. NLRB,*
    252 F.3d 445 (D.C. Cir. 2001)................................................................2
*Rhode Island Hospital,* *
    313 N.L.R.B. 343 (1993) ..........................................................26, 27
*S.E.C. v. Chenery Corp.,* *
    318 U.S. 80 (1943) ........................................................................18
*Sacred Heart Medical Center,* 347 N.L.R.B. 531 (2006),
    *remanded* 526 F.3d 577 (9th Cir. 2008), *decision on remand* 353
    N.L.R.B. 147 (2008) ....................................................................20
*Saint John's Health Center,*
    357 N.L.R.B. No. 170 (2011) ......................................................20
*SEIU United Healthcare Workers-West,*
    350 N.L.R.B. 284 (2007) ..............................................................19
*St. Francis Hospital,* 271 N.L.R.B. 948 (1984),
    *remanded Int'l Bhd. of Elec. Wkrs., Local U. No. 474 v. NLRB,* 814
    F.2d 697 (D.C. Cir. 1987), *decision on remand* 286 N.L.R.B. 1305
    (1987)........................................................................................15
*St. John's Hospital,* *
    307 N.L.R.B. 767 (1993) ......................................................4, 5, 6
*St. Mary's Duluth Clinic Health Sys.,* *
    332 N.L.R.B. 1419 (2000) ................................5, 6, 11, 12, 17
*St. Vincent Charity Medical Center,*
    357 N.L.R.B. No. 79 (2011) ..................................4, 5, 6, 8, 13, 19
*Trump Plaza Assocs. v. NLRB,*
    679 F.3d 822 (D.C. Cir. 2012)....................................2, 4, 12
*University of West Los Angeles,* *
    321 N.L.R.B. 61 (1996) ..............................................................26
*West Jersey Health Sys.,*
    293 N.L.R.B. 749 (1989) ........................................................19, 20
*Western Union Corp. v. FCC,*
    856 F.2d 315 (D.C. Cir. 1988)....................................................18

**Statutes**
29 U.S.C. § 158(g) ........................................................................19

**Rules and Regulations**
29 C.F.R. § 102.48(d)(1)..............................................................21

CHICAGO/#2749507.5

# TABLE OF AUTHORITIES

(continued)

29 C.F.R. § 103.30(c) ............................................................................. 3, 11

Fed. R. Evid. 201 ................................................................................. 21

**Other Authorities**

Collective-Bargaining Units in the Health Care Industry,
   53 Fed. Reg. at 33933 (Sept. 1, 1988), reproduced at 284 N.L.R.B. at
   1575 * ...................................................................................................... 13

Collective-Bargaining Units in the Health Care Industry,
   54 Fed. Reg. at 16346 (Apr. 21, 1989), reproduced at 284 N.L.R.B. at
   1595 ......................................................................................................... 14

Authorities primarily relied upon are marked with an asterisk.

CHICAGO/#2749507.5

# GLOSSARY OF ABBREVIATIONS

- "CBA" – Collective Bargaining Agreement.

- "D&DE" – Acting Regional Director's Decision and Direction of Election in NLRB Case No. 13-RC-132042.

- "Health Care Rule" or "Rule" – 29 C.F.R. § 103.30, the NLRB rule that became effective on May 22, 1989 regarding appropriate collective bargaining units in acute health care institutions.

- "NAII" – Nurse Assistant II.

- "NLRA" – National Labor Relations Act, 29 U.S.C. § 151 *et seq.*

- "NLRB" or "Board" – National Labor Relations Board.

- "PCT" – Patient Care Technician.

- "Rush" – Rush University Medical Center, the Petitioner.

- "The Union" – International Brotherhood of Teamsters, Local 743, the Intervenor.

CHICAGO/#2749507.5

## INTRODUCTION AND SUMMARY OF ARGUMENT

The NLRB and Union briefs suffer from the same failings as the NLRB's underlying decision. They have not explained why repetitive, piecemeal elections and negotiations do not present an unwarranted and unnecessary risk of strikes and other disruptions to patient care in acute-care hospitals. From 1974, when not-for-profit hospitals were added to the NLRA's jurisdiction, until 2011, the NLRB agreed that they did. As a result, the NLRB required acute-care hospital employees considering unionization to join together and vote on union questions only in the large units that the NLRB found appropriate. This reduced the number of elections and negotiations at acute-care hospitals and the associated risks of wage whipsawing and strikes. In the past, whenever nonconforming units already existed at an acute-care hospital, the NLRB reached the same result and required all remaining employees residual to the nonconforming unit to vote in a single election as well. That too reduced the number of elections and negotiations and avoided the same risks.

As Rush stated in its Principal Brief (at 25-26), NLRB determinations regarding an appropriate bargaining unit should be

overturned if they are arbitrary and capricious or not supported by substantial record evidence. *Blue Man Vegas, LLC v. NLRB*, 529 F.3d 417, 420 (D.C. Cir. 2008), citing *Country Ford Trucks v. NLRB*, 229 F.3d 1184, 1189 (D.C. Cir. 2000). "Where an agency departs from established precedent without a reasoned explanation, its decision will be vacated as arbitrary and capricious." *Trump Plaza Assocs. v. NLRB*, 679 F.3d 822, 827 (D.C. Cir. 2012), citing *Pirlott v. NLRB*, 522 F.3d 423, 432 (D.C. Cir. 2008). This Court has "repeatedly told the Board that 'silent departure from precedent' will not survive judicial scrutiny." *Randell Warehouse of Arizona, Inc. v. NLRB*, 252 F.3d 445, 448-49 (D.C. Cir. 2001); *Lemoyne-Owen College v. NLRB*, 357 F.3d 55 (D.C. Cir. 2004).

In this case, the NLRB departed from its long-standing policy with no meaningful consideration of its precedent or explanation of how the risks posed to acute-care patients have changed. The current case is the first opportunity for the Circuit Courts to review the NLRB's about-face. Because the NLRB failed to address or account for the risks of piecemeal elections and negotiations in an acute-care setting and

departed from its precedent, the Court should grant review and deny enforcement.

In the alternative, the Court should grant review and deny enforcement because the NLRB failed to include NAIIs in the voting unit with PCTs.  Notwithstanding the minor differences on which the NLRB relies in its brief, there is no real dispute that in virtually all respects, NAIIs and PCTs are interchangeable.  They work side by side and perform identical duties under a common schedule and under the direction of the same managers.  Existing NLRB precedent requires the inclusion of NAIIs in these circumstances notwithstanding their status as students.

## ARGUMENT

## I.   ALLOWING REPETITIVE, PIECEMEAL ELECTIONS AND NEGOTIATIONS IN AN ACUTE-CARE HOSPITAL IS CONTRARY TO NLRB REGULATION AND POLICY AND DISRUPTIVE TO PATIENT CARE.

### A.   The Health Care Rule and NLRB Case Law Required Residual Employees to Be Organized in a Single Election until the NLRB's Recent Change.

Both the NLRB and the Union argue in their briefs, at length, that section 103.30(c) of the Health Care Rule and the policies that underlie the Rule have never applied to *Armour-Globe* petitions seeking

3

to add employees to existing nonconforming units. The NLRB's own precedent holds otherwise, and its unexplained departure from that precedent alone is grounds for reversal. *See Trump Plaza Assocs. v. NLRB*, 679 F.3d at 827 ("Where an agency departs from established precedent without a reasoned explanation, its decision will be vacated as arbitrary and capricious.")

    1.    **The NLRB in *St. John's* Concluded that Piecemeal Residual Elections Are Not Permitted Even When Employees Are to be Added to an Existing Unit.**

The NLRB's brief (at 35-36) tries to rewrite *St. John's Hospital*, 307 N.L.R.B. 767, 768 (1993), and ignores the rest of its case law just as the NLRB did in *St. Vincent Charity Medical Center*, 357 N.L.R.B. No. 79 (2011), slip op. at 3-4. But *St. John's* did not fail to decide whether an incumbent union must seek to represent all remaining employees residual to an existing unit, as the NLRB belatedly claims. (Nor did other NLRB cases.) Rather, the NLRB in *St. John's* squarely ruled on that issue:

> However, we also find in the circumstances presented here, because the Petitioner already represents a nonconforming unit of skilled maintenance employees, *if the Petitioner seeks to represent any of the remaining unrepresented skilled maintenance employees, the*

4

> *Petitioner must represent all the remaining skilled*
> *maintenance employees as part of its existing unit of*
> *plumbers and refrigeration employees.*

*St. John's*, 307 N.L.R.B. at 768 (emphasis added).

The NLRB's contrary reading in its brief and in *St. Vincent* fails to provide any reasoned explanation for a departure from its long-standing precedent as this Court requires.[1]

Until 2011, there was no dispute regarding the meaning and application of *St. John's*.  Indeed, contrary to the assertions of the NLRB (brief at 37-38), the Board reaffirmed its decision in *St. John's* and extended its reasoning to create a parallel path for residual employees to be represented by a nonincumbent union so long as all residual employees were included in the unit.  *St. Mary's Duluth Clinic Health Sys.*, 332 N.L.R.B. 1419 (2000).  According to the NLRB in that case, "[*St. John's*] held that *any election* to determine a representative

---

[1] The NLRB's unavailing attempt in *St. Vincent* to "distinguish" the holding in *St. John's* also disregards the NLRB's long-standing rule that NLRB precedent can be reversed only by a three-member majority.  *See*, *e.g.*, *Progressive Elec., Inc. v. NLRB*, 453 F.3d 538, 552 (D.C. Cir. 2006) (recognizing NLRB's practice of adhering to precedent absent a three-vote majority to overrule it, and enforcing on other grounds a Board decision that followed the practice).  *St. Vincent* was decided by only a three-member panel of the Board, with two members in the majority and one dissenting.  As such, the *St. Vincent* panel could not overrule *St. John's*.

for unrepresented skilled maintenance workers would have to include *all the remaining skilled maintenance workers residual to the existing unit* or units." *St. Mary's*, 332 N.L.R.B. at 1419 (emphasis added). The NLRB then held that a nonincumbent union could petition to represent this same residual unit. In doing so, the NLRB still sought to "encourage[e], but not require[e], the incumbent union to seek to add the residual employees to its existing union." *Id.* at 1422. It did so by giving the incumbent union a place on the ballot without a showing of interest. But the NLRB emphasized that the residual unit was appropriate and that a vote would be held only because the petitioned-for unit "includes *all* of the unrepresented technical employees who are residual to the [existing union's nonconforming] unit." *Id.* at 1422 (emphasis in original).[2]

---

[2] *St. Mary's Duluth* also directly addressed and contradicted the position of the NLRB in its brief (at 35-37) and in *St. Vincent*, 357 N.L.R.B. No. 79, slip op. at 3, claiming that *St. John's* addressed only whether an incumbent union had to add residual employees to its existing unit but never addressed whether an incumbent union could seek an election of some, but not all, residual employees. *St. Mary's Duluth* on its face discusses that the NLRB addressed and decided both questions in *St. John's*. 332 N.L.R.B. at 1419.

6

## 2. Requiring All Residual Employees to Vote in a Single Election Is Consistent with *Armour-Globe* Election Principles.

To support their positions, the NLRB (brief at 18-19 and 22-26) and the Union (brief at 6-9 and 17-19) argue at some length that the NLRB's *Armour-Globe* cases provide further support for their position that piecemeal elections are allowed in acute-care facilities so long as such elections are among residual employee groups. The NLRB describes this as a "well-accepted" and "venerable" principle "used 'in countless cases.'" Brief at 18.[3]

But until its appeal brief, the NLRB long accepted the principle that a petition for an *Armour-Globe* election at an acute-care hospital required that all remaining employees residual to the existing unit be included as part of the petition. Thus, it is not surprising that neither

---

[3] The Union (at 18) goes further and argues that requiring a wall-to-wall vote among all employees residual to its nonconforming unit rather than breaking up that unit into "distinct and homogenous group[s]" would amount to impermissible "gerrymandering" and would force groups not wanting representation into the larger unit. (Citations omitted.) This suggestion defies logic. It is the Union that proposes to return to gamesmanship by allowing litigation over which groupings of employees are sufficiently "distinct and homogenous" to be afforded a separate vote. Rush simply asks that the remaining employees residual to the NLRB's eight objective health care units vote as an appropriate unit.

7

the NLRB nor the Union has cited to this Court a single *Armour-Globe* acute-care hospital case other than *St. Vincent* to support their novel view.

Instead, the pertinent *Armour-Globe* acute-care hospital cases support Rush's view.  In *Mary Thompson Hospital, Inc.*, 242 N.L.R.B. 440 (1979), an umbrella organization that included the Union in this case represented 135 employees at Mary Thompson Hospital in Chicago.  In 1978, the union filed for an *Armour-Globe* "self-determination election" among some but not all employees residual to its existing unit.  The NLRB found that impermissible.  Rather, "the voting group must at least include all unrepresented employees of the same type or category included in the existing unit so that their addition would 'complete' or 'correct' the existing unit so as to bring it into conformity with some unit which the Board would find appropriate for the health care industry."  *Id.* at 441.  The NLRB "regard[ed] this requirement as consistent with our refusal to approve most 'residual' units in this industry."  *Id.* at 441 n.9.

*Mary Thompson Hospital* cited *Oakwood Hospital Corp.*, 219 N.L.R.B. 620 (1975), which reached the same result.  The union there

8

represented a unit of 500 service and maintenance employees. It filed for an *Armour-Globe* election to add 49 additional service employees to its nonconforming unit. Because "the Petitioner does not seek to add all of the unrepresented service clerical employees of the hospital to the existing unit," the NLRB ruled that "the requested voting group is not appropriate for the purpose of holding a *Globe* election."[4]

The NLRB continued to apply these principles after the enactment of the Health Care Rule. In *Kaiser Foundation Health Plan of Colorado*, 333 N.L.R.B. 557 (2001), a union represented a mixed unit of health care employees in the employer's inpatient and outpatient health care facilities. Applying the "principles and analyses" from acute-care cases, the NLRB found that the petition could proceed because the "employees are the Employer's only unrepresented healthcare employees and are residual to the existing SEIU non-professional unit." *Id.* at 558. The NLRB emphasized that "The Regional Director properly

---

[4] The NLRB applied this same reasoning to permit a petition to proceed in *McKeesport Hospital*, 220 N.L.R.B. 1141 (1975). There, a Teamster local already represented 500 nonprofessional employees and petitioned to represent a "residual" unit that included all "unrepresented employees performing service and maintenance functions." Because the petition covered "the only unrepresented employees performing service and maintenance functions," the NLRB found these employees "constitute a proper residual unit." *Id.* at 1142.

9

concluded that any residual unit must necessarily include all unrepresented employees of the type covered by the petition." *Id.* at 558 n.8.

The other two cases chiefly relied upon by the NLRB (brief at 30-34), *Kaiser Foundation Hospitals*, 312 N.L.R.B. 933 (1993), and *Crittenton Hospital*, 328 N.L.R.B. 879 (1999), are simply not on point. Both involved attempts to force changes to an existing nonconforming unit over another party's objection, not attempts to add unrepresented employees to such a unit as is the case here.  In *Kaiser*, a nonincumbent union petitioned to sever 50 skilled maintenance employees from another union's preexisting nonconforming unit.  Dismissing the petition, the NLRB concluded that the Health Care Rule did not allow a nonincumbent union "to sever, or carve out, a group of employees from an existing unit, whether or not that unit conforms to those established by the rule."  It reasoned that there was no compelling reason to disturb an established unit with a stable bargaining relationship when no new employees were to be added.  *Kaiser*, 312 N.L.R.B. at 934.

Significantly, the *Kaiser* Board commented that the Rule applied to petitions seeking to represent currently unrepresented employees:

10

"By its terms, Section 103.30(c) applies only to petitions for 'additional units,' that is, petitions to represent a *new unit of previously unrepresented employees, which would be an addition to the existing units at a facility*." *Id. (*emphasis added).[5] Here, the PCTs at issue also had been "previously unrepresented." And following the PCT election, the NLRB issued a different certification for a new unit of employees that included the PCTs.

In *Crittenton*, a rival union petitioned for an election to represent an existing nonconforming unit of nurses, challenging the incumbent union that represented them. The incumbent union sought to expand the unit to include other unrepresented nurses. The Board allowed the election in the existing nonconforming unit, relying on *Kaiser* and once again concluding that, under the circumstances, an existing, stable unit need not be dismantled. 328 N.L.R.B. at 880-81.

A year later, in the *St. Mary's* decision, the Board explained as much about *Kaiser* and *Crittenton*, stating, "In both *Kaiser* and *Crittenton*, the Board concluded that it was not the intent of the Rule to

---

[5] In support of that statement, the Board referenced the definition of "additional," remarking that "Webster's Third New International Dictionary defines 'additional' as 'existing or coming by way of addition – added, further . . .'" *Id.* at 934 n.7.

CHICAGO/#2749507.5

require the abandonment of, and replacement of, existing historical
units with units that specifically conform to those set forth in the Rule."
*St. Mary's*, 332 N.L.R.B. at 1421.

As much as the NLRB may wish to rewrite its prior decisions, for
37 years, from 1974 to 2011, *Armour-Globe* residual elections in acute-
care hospitals included all employees residual to an appropriate unit
recognized by the NLRB. The NLRB cannot simply wish away its
established case law, and attempts to do so will be appropriately
vacated as arbitrary and capricious. *Trump Plaza Assocs.*, 679 F.3d at
827.

## B. A PCT-Only Election Is At Odds with Established Labor Policy.

The most glaring shortcoming of the NLRB and Union briefs, like
the NLRB decision below, is their continued failure to address the risks
to patient care inherent in repetitive, piecemeal elections and the
resulting piecemeal negotiations. While these sorts of disruptions have
been tolerated in other workplaces, Congress and the NLRB have
struck a different balance in cases involving acute-care hospitals. And
for that reason, the NLRB requires larger units both in initial

12

organizing drives and in petitions to add employees to a preexisting

unit that does not conform to these requirements.

As an initial matter, the NLRB (brief at 38-40) asserts that the

risk of disruption from repetitive elections and negotiations has never

been a concern of the NLRB or Congress, and that the only issue has

been "unit proliferation."  Because all the PCTs will be added to the

Union's existing bargaining unit, the NLRB claims there is no reason to

look further.  NLRB Brief at 35-36, 39; *St. Vincent*, slip op. at 3; *see also*

Union Brief at 16-17.

The NLRB is simply wrong.  The risks to patients from strikes

and other disruptions that can and often do occur during organizing and

negotiations have been a core concern of the courts, the NLRB and

Congress for decades.  To be sure, Congress and the NLRB have sought

to avoid unit proliferation too.  But they did so to avoid "the problems

perceived to arise from proliferation."  Those problems included "a

never-ending round of bargaining sessions."  Collective-Bargaining

Units in the Health Care Industry, 53 Fed. Reg. at 33933 (Sept. 1,

1988), reproduced at 284 N.L.R.B. at 1575.  It also included the risk of

"repeated work stoppages, jurisdictional disputes, and wage

whipsawing, and other related evils." Collective-Bargaining Units in the Health Care Industry, 54 Fed. Reg. at 16346 (Apr. 21, 1989), reproduced at 284 N.L.R.B. at 1595.

Breaking residual employees into a series of penny-packets for organizing and bargaining implicates all of these same concerns. Elections themselves can be disruptive and take employee focus away from patient care. After each election that the union wins, there will be another piecemeal bargaining session for the newly added group of employees, and with bargaining at each step comes the risks noted above.

Although the NLRB ignored those issues here, the courts and the Board have acknowledged that elections are disruptive, and that hospital patients should be protected from those disruptions. It is for that reason that federal labor policy has always limited employee organizational rights so as "to avoid disruption of patient care and disturbance of patients." *NLRB v. Baptist Hospital, Inc.*, 442 U.S. 773, 778 (1979) (finding that a hospital, unlike other employers, may attempt to ban all union solicitation in patient care areas to protect against disruptions to patients).

14

For decades the NLRB has acknowledged that these concerns justify limitations on the units in which hospital employees may vote and ultimately bargain, requiring larger units and resulting in fewer elections and negotiations. "The paramount public interest in maintaining uninterrupted accessibility to health care facilities required that further protection and special care would have to be taken to avoid the ultimate disruptions in health care institutions caused by organizing drives and related activities such as strikes and slowdowns." *St. Francis Hospital*, 271 N.L.R.B. 948, 951 (1984), *remanded Int'l Bhd. of Elec. Wkrs., Local U. No. 474 v. NLRB*, 814 F.2d 697 (D.C. Cir. 1987), *decision on remand* 286 N.L.R.B. 1305 (1987).

As Rush noted in its opening brief (at 40-41), the risk of work stoppages, never-ending bargaining and wage whipsawing – which justify the NLRB's Health Care Rule – are also risks that flow from piecemeal elections. Each new small group added to an existing bargaining unit is <u>not</u> covered by the existing collective bargaining agreement between Rush and the Union. Rather, just as each new group will have a separate election campaign, it is blackletter law that each small group of employees will negotiate separately for its initial

15

wage and benefit package and other terms of the contract that will

cover them. *Beverly Health and Rehab. Servs.*, 322 N.L.R.B. 968 (1997).

For that reason, all of the risks of strikes, wage whipsawing and other

disruptions that come with bargaining will be repeated over and over

again under the NLRB's new piecemeal approach to elections. The only

way to avoid such disruptions is to follow the rule the NLRB

consistently applied for decades and require all remaining employees

residual to a nonconforming unit to vote together and then bargain

together as a single group.

### C.   The NLRB Inexplicably Failed to Give Any Consideration to the Risks Associated with Organizing, Negotiations and Strikes Discussed in Its Case Law and in Rush's Offer of Proof.

In its brief (at 43), the NLRB admits that repetitive and lengthy

negotiations, pickets and strikes might result from splintered residual

elections. But it dismisses these concerns as something that "the Board

. . . properly resolved" in favor of allowing piecemeal residual elections

so as to avoid "ban[ning] the basic organizational rights of employees."

*Id.* at 41, citing D&DE at 3-4 (A10-11). In the alternative, it claims that

the risk of additional elections or disruptions during negotiations are

16

"unsubstantiated speculation" and unworthy of the NLRB's consideration. *Id*. at 43.

As to the claim that employees will be denied any right to organize if piecemeal organizing is not permitted in an acute-care hospital, the same could be said for any election held among the eight large voting groups that the NLRB continues to require under its Health Care Rule. Yet the NLRB's Health Care Rule continues to require their use for all organizing where no incumbent union exists, and the NLRB continues to require a nonincumbent union to hold an election among all employees residual to an existing nonconforming unit. *St. Mary's Duluth Clinic Health Sys.*, 332 N.L.R.B. 1419 (2000). The NLRB cannot explain how those positions can be reconciled with its argument here. Moreover, in 2004 and 2006, the Union filed petitions to represent all remaining nonprofessional employees at Rush, and the NLRB twice held elections among that residual group. The Union lost both times. (A221, A232-34, A239-54.) The NLRB and the Union's complaint is less about whether employees are denied the right to vote and more about whether the Union won or lost the election. That is not the NLRB's role.

17

Regardless, the NLRB never made any of the findings that its brief now asks this Court to uphold. Even a cursory reading of the D&DE demonstrates that the NLRB did not acknowledge, much less address, either Rush's offer of proof or the broader risk to patient care the Board has previously recognized in its jurisprudence. Nor did it make a finding that Rush's position would "ban the basic organizational rights of employees." The NLRB's counsel cannot ask the Court to defer to a judgment the NLRB itself never made, much less one that goes against 40 years of its own jurisprudence. *BB&L, Inc. v. NLRB*, 52 F.3d 366, 369 (D.C. Cir. 1995) ("Nevertheless, the Board cannot ignore its own relevant precedent but must explain why it is not controlling.") It is a basic precept of administrative law that review of an agency's order must be confined to the "grounds upon which the [agency] itself based its action . . ." *S.E.C. v. Chenery Corp.*, 318 U.S. 80, 88 (1943). Stated somewhat differently, "Post hoc rationalizations by agency counsel will not suffice." *Western Union Corp. v. FCC*, 856 F.2d 315, 318 (D.C. Cir. 1988). *See also Detroit Newspaper Agency v. NLRB*, 435 F.3d 302, 313 (D.C. Cir. 2006) (Henderson, J., dissenting) ("No principle is better-settled in administrative law than that we are to uphold an agency

18

order based *only* on reasoning fairly stated by the agency in the order under review.") (emphasis in original).

From 1974, through its enactment of the Health Care Rule in 1989, and up until its recent decisions here and in *St. Vincent*, the NLRB has found that campaigns, negotiations and their attendant strike risks are of concern and are to be avoided in an acute-care environment. The NLRB has not ordinarily required individualized proof of such risks. That was one of the prime reasons for adoption of the Health Care Rule. The range of disruptive actions that can result are well documented in the NLRB's own jurisprudence. They include, for example, strikes and threats of strikes, sympathy strikes by other hospital workers, and publicity campaigns that can and do frighten vulnerable patients. *See*, *e.g.*, *SEIU United Healthcare Workers-West*, 350 N.L.R.B. 284 (2007) (union violated Section 8(g) of the NLRA, 29 U.S.C. § 158(g), by sanctioning a concerted refusal to work overtime without providing the required notice); *Children's Hospital Oakland*, 351 N.L.R.B. 569 (2003) (dismissing complaint against hospital employer who filed a lawsuit asserting that union's sympathy strike violated the parties' collective bargaining agreement); *West Jersey*

19

*Health Sys.*, 293 N.L.R.B. 749, 751 (1989) (decision predating Health Care Rule that found a single facility unit inappropriate in a hospital system, and dismissed a petition because a union would not participate in a system-wide election, reasoning that ". . . a labor disruption at one division, where some function is centralized, would adversely affect the health care available at other divisions in the Employer's system . . ."); *Saint John's Health Center*, 357 N.L.R.B. No. 170 (2011) (NLRB found that, during organizing campaign, employer was required to permit employees to wear, in immediate patient care areas, ribbons distributed by union organizers with the slogan, "Saint John's RNs for Safe Patient Care"); *Sacred Heart Medical Center,* 347 N.L.R.B. 531 (2006), *remanded* 526 F.3d 577 (9th Cir. 2008), *decision on remand* 353 N.L.R.B. 147 (2008) (overturning, then on remand from Ninth Circuit, affirming administrative law judge's decision that union campaign to promote the wearing of buttons that read "RN's Demand Safe Staffing" as part of negotiations campaign was protected conduct).

Even if individualized proof were required (and there is no NLRB case law supporting that position), Rush sought to offer evidence of disruption but was not allowed to do so. Instead, the NLRB refused to

20

receive the evidence and required Rush to make an offer of proof. At page 41 of its brief, the NLRB claims that offer of proof was given "appropriate weight." But it cites to a page from the hearing transcript, not the D&DE itself, which does not address these issues. The NLRB also refused to consider the Union's post-election announcement of its strategy to continue using piecemeal elections to organize the remaining residual employees and the four additional petitions filed by the Union in the coming months. (A107.) In sum, the NLRB failed to consider the evidence at all.[6]

This is not a case in which the NLRB carefully weighed the risks from multiple elections and negotiations and balanced them against employee organizational rights. Had it done so, it would have struck

---

[6] The NLRB claims that its refusal to consider its own post-election actions to allow further elections at Rush was proper and that it would be improper for this Court to consider them now. But the Court and the NLRB clearly have authority to do so. FED. R. EVID. 201; *Don Lee Distributor, Inc. v. NLRB*, 145 F.3d 834, 841 n.5 (6th Cir. 1998) ("it is appropriate to take judicial notice of 'adjudicative facts' such as agency and judicial decisions, even where those decisions contain disputed statements of fact, as long as we take judicial notice for some purpose other than to take a position on the disputed fact issue"). Notwithstanding the NLRB's claim to the contrary, its own rule allows the receipt of "evidence which has become available only since the close of the hearing." 29 C.F.R. § 102.48(d)(1). There is no requirement that the evidence must have been in existence at the time of the hearing.

21

the same balance it reached in issuing the Rule and its prior decisions by requiring all unions seeking to represent new groups of employees at an acute-care hospital to petition for units, both new or residual, that conform to the eight units set out in the Health Care Rule.

## II.   THE BOARD'S BRIEF MISAPPLIES NLRB PRECEDENT AND MISCONSTRUES THE FACTUAL RECORD REGARDING NURSE ASSISTANT IIs.

In the alternative, the NLRB's decision should not be enforced because the NLRB disregarded its precedent by excluding NAIIs from the voting unit with PCTs.  It also ignored large swaths of a factual record that was largely undisputed.[7]

### A.   Undisputed Facts Demonstrated that PCTs and NAIIs Are Nearly Identical.

As an initial matter, the NLRB's brief (at 45) seeks to rewrite the D&DE to suggest that the NLRB did not exclude NAIIs "based solely on the NAIIs' student status but instead discusses the traditional community-of-interest factors."  That is not the case.  To the contrary, the D&DE (at 5-8) acknowledged that NAIIs and PCTs "perform common duties under many of the same working conditions," have "job

---

[7] With regard to the NAIIs, Rush's reply brief focuses on the NLRB's brief.  The Union's brief (at 23-24) did nothing more than parrot a passage from the D&DE and provides no further arguments requiring an additional response.

CHICAGO/#2749507.5

duties" viewed as "interchangeable" by Rush, are assigned

interchangeably on the schedules "without regard to the ratio" between

them, "assist one another if they become busy," and receive the same

unit-based "on-boarding" training and "periodic training and annual

competency assessment[s]." (A12-15.)  The D&DE bluntly states that

the Board is excluding them "because they possess different work

interests and objectives by virtue of their status as nursing students."

*Id.*  That is contrary to the NLRB's own case law and as such is

arbitrary and capricious.[8]

    Rather than focusing on the numerous similarities and explaining

why the D&DE could exclude NAIIs based on their student status, the

NLRB's brief (at 45-48) instead attempts to exaggerate the importance

---

[8]  In its brief, the NLRB asserts that "in at least one unit, PCTs and
NAIIs are not assigned interchangeably."  NLRB Brief at 7.  That
assertion is contrary to the Board's finding in the D&DE, in which the
Regional Director concluded as follows: "In addition, the PCTs and NA
IIs are permitted to fill in for each other and trade work days as long as
they obtain the prior approval of their Unit Director or Assistant Unit
Director."  D&DE at 8.  The reference to the record that the Board cited
in its brief (A214) was given no weight in the D&DE's factual findings.
That is likely because it was contrary to every other witness, who
testified that PCTs and NAIIs are scheduled interchangeably.  The
Board cannot reverse course and attempt to rely upon that claim when
it reached the exact opposite conclusion in the D&DE.

CHICAGO/#2749507.5

of the minor differences between the two classifications.  The Board

focused on three major issues: wages, training and status as students.

As to wages, the NLRB claims that PCTs and NAIIs have

different wage rates.  NLRB Brief at 45-46.  But it failed to note the

undisputed evidence that the difference in starting wage rates

accounted for differing levels of starting education, and PCTs with two

years of experience (comparable to the two years of education most

NAIIs start with) receive wages comparable to an NAII.  (A167.)

The NLRB tries to claim that training differs between the PCTs

and NAIIs.  However, this is not supported by the record.  The D&DE

found (at 7)  (A14.) that NAIIs have a shorter initial classroom basic

skills orientation than PCTs because they have already received

comparable instruction in nursing school.  (A165, A168-69, A178.)  After

that initial classroom orientation, both groups receive identical training

on the patient care floor, and the training is provided interchangeably

for both PCTs and NAIIs.  (A14, A165-66, A175, A279-85.)

The third issue, status as students, goes beyond just disregarding

the record facts and leads into a larger issue discussed in the next

section:  the NLRB's disregard of its own precedent regarding the

CHICAGO/#2749507.5

criteria for determining whether students vote as employees. As explained below, that further supports the inclusion of NAIIs with PCTs.

### B. NLRB Precedent Requires Inclusion of NAIIs with PCTs.

The Board's third and final attempt at distinguishing NAIIs and PCTs – that NAIIs are students and inherently cannot share a community of interest with non-student PCTs – is contrary to the NLRB's precedent.  The NLRB's brief principally cites that NAIIs must remain enrolled in nursing school to be employed as NAIIs (brief at 47) and an online document containing a statement that the NAII position can be a "wonderful opportunity to gain experience to increase clinical confidence."  Brief at 48, quoting Tr. 243, Pet. Ex. 2.  (A212, A352.)  The NLRB extrapolates from these facts that NAIIs are primarily interested in their educational goals.

That NAIIs may gain incidental experience that could prove useful in a later career is not sufficient to exclude them from the vote, particularly in the face of all of the close community of interest the two groups enjoy.  The Board's own cases support this point, and the NLRB

cannot explain why they do not require the inclusion of NAIIs with the PCTs on the facts here.

In *University of West Los Angeles*, 321 N.L.R.B. 61 (1996), for example, the NLRB found that law students working in a law library with non-student law librarians must be included in a vote covering librarians even though their work might help them in their later legal careers. The mere fact that they were students who worked part-time and did not receive benefits was not enough to overcome the fact that students and nonstudent clerks, like the PCTs and NAIIs here, worked closely together and performed the same tasks under common supervision. *Id.* at 61-62. Because their "employment [was] not merely incidental to their academic objectives," the NLRB included them. *Id.* at 61.[9]

The same holds true with the pharmacy students in *Rhode Island Hospital,* 313 N.L.R.B. 343, 365-66 (1993), who the NLRB included in an election with non-student pharmacy technicians. Like the NAIIs, they were required to be enrolled in an accredited college of pharmacy

---

[9] The student-librarians in *West Los Angeles*, who were enrolled in law school there, arguably had a closer relationship to their educational institution than the NAIIs at Rush, most of whom were nursing students at other institutions. (A168.)

CHICAGO/#2749507.5

and were typically hired two or three years into their educational program. *Id.* at 365. But despite their student status, because they performed the exact same work and worked side by side with the other non-student pharmacy technicians, the NLRB included them even though the work was relevant to the students' field of study. *Id.*

The NLRB's retort (brief at 48-49) is that NAIIs are more like the Collegiate Nursing Assistants ("CNA") in *Rhode Island Hospital* whom the NLRB excluded from the vote with nursing assistants. CNAs were students, but that is not the sole reason why they were excluded. Rather, the NLRB found that the CNAs had "more sophisticated duties than the nursing assistant[s]" that made their skills "comparable to those of an LPN." 313 N.L.R.B. at 364. That included the ability to perform invasive procedures, such as catheterization, adjustment of intravenous solutions and administration of respiratory treatment. At bottom, the NLRB concluded that the "principal function of the position is to give the opportunity for "students of professional nursing to apply, with supervision, the knowledge, clinical and cognitive skills and values essential for making clinical judgments [sic] based on the nursing process." *Id.* The significant differences in duties, supervision and

27

routine use of skills learned in nursing school simply are not present in this case.

In summary, NAIIs and PCTs are two groups of employees doing the exact same job with the same supervision, but only one was included in the election.  That distinction without a difference defies both case law and common sense.

## CONCLUSION

Because the NLRB disregarded its own precedent and policies, as well as the Rule and the factual record, the Court should grant Rush's petition for review and deny the Board's petition for enforcement.

Dated:  September 17, 2015      Respectfully submitted,

RUSH UNIVERSITY MEDICAL CENTER


By: s/ Kenneth F. Sparks
    One of Its Attorneys

Kenneth F. Sparks
Mark L. Stolzenburg
Vedder Price P.C.
222 North La Salle St., Suite 2600
Chicago, Illinois  60601
Telephone:  312.609.7500
Facsimile:  312.609.5005

CHICAGO/#2749507.5

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure and Circuit Rule 32(a)(2), I hereby certify that the textual portion of the foregoing brief (exclusive of the certificates of service and compliance, but including footnotes) contains 5,720 words as determined by the word-counting feature of Microsoft Word.  The brief was prepared in Century Schoolbook font, 14-point, which is proportionally spaced.

s/ Kenneth F. Sparks

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 17th day of September, 2015, on behalf of Petitioner Rush University Medical Center, I electronically filed the foregoing document with the Clerk of the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system, which will send notification of such filing to the following counsel:

Ms. Linda Dreeben
Ms. Elizabeth Heaney
National Labor Relations Board
1015 Half Street, S.E.
Washington, DC 20570

Mr. Gary Witlen
International Brotherhood of
Teamsters
25 Louisiana Ave., N.W.
Washington, DC 20001

Mr. Joel A. D'Alba
Asher, Gittler & D'Alba, Ltd.
200 W. Jackson Blvd., Suite 1900
Chicago, IL 60606

Mr. James Coppess
AFL-CIO
815 Sixteenth Street, N.W.
Washington, DC 20006

Ms. Jacqueline M. Holmes
Jones Day
51 Louisiana Ave., N.W.
Washington, DC 20001

Mr. F. Curt Kirschner, Jr.
Jones Day
555 California St., 26th Floor
San Francisco, CA 94104

s/ Kenneth F. Sparks